LIBERTY AMERICAN INSURANCE GROUP, INC., et al., Plaintiffs,

v.

WESTPOINT UNDERWRITERS, L.L.C., et al., Defendants.

Case No. 8:01–CV–573–T–17–EAJ.

United States District Court,
M.D. Florida,
Tampa Division.

March 15, 2001.

Margaret Diane Mathews, Akerman, Senterfitt & Eidson, P.A., Tampa, FL, David E. Landau, Adam H. Cutler, Wolf, Block, Schorr and Solis-Cohen, LLP, Philadelphia, PA, for Liberty American Ins. Group, Inc., Mobile Homeowners Ins. Agencies, Inc.

Brian A. McDowell, Scott Justice, Holland & Knight, LLP, Orlando, FL, Griffith J. Winthrop, III, Alvarez, Sambol, Winthrop & Madson, P.A., Orlando, FL, for Westpoint Underwriters, L.L.C., Modern Service Ins. Co., Lyle Vincent, T. John Jerger, Jr.

Lee H. Rightmyer, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., St. Petersburg, FL, for American Strategic Ins. Corp.

William Donald Cox, Richard G. Salazar, Nestor J. Rivera, Fowler White Boggs Banker, P.A., Tampa, FL, for Sandra Jerger.

Sandra Jerger, Pinellas Park, FL, pro se.

### ORDER

KOVACHEVICH, Chief Judge.

THIS CAUSE comes before the Court for consideration of Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in support thereof (Dkt.Nos.2–3); Defendants' Response in Opposition (Dkt.Nos.49–50); Report and Recommendation from United States Magistrate Judge Elizabeth A. Jenkins (Dkt. No. 75); Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 77); Defendants' Response to Liberty American's Objections to Magistrate's Report and Recommendation (Dkt. No. 84); Plaintiffs' Amended Objections to Report and Recommendation (Dkt. No. 88); Defendants' Objections to Magistrate's Report and Recommendation (Dkt. No. 79); and Amended Plaintiffs' Response to Defendants' Objections to Report and Recommendation and Motion to Strike (Dkt. No. 89).

### Procedural Background

Plaintiffs, Liberty American Insurance Group, Incorporated and Mobile Homeowners Insurance Agencies (Plaintiffs), filed a Motion for Preliminary Injunction on March 15, 2001, in which they petition this Court to enjoin Defendant Westpoint Underwriters, L.L.C. (Defendant Westpoint) from using Liberty American's rating software and park file information; and Defendants Lyle Vincent (Defendant Vincent) and T. John Jerger, Jr. (Defendant Jerger) from working for Defendant Westpoint. The Honorable James S. Moody, Jr. United States District Judge, referred the motion to the Honorable Elizabeth A. Jenkins, United States Magistrate Judge, by Order of Referral, dated March 16, 2001 (Dkt. No. 5) under authority of Title 28, United States Code, Section 636(b)(1)(B); Federal Rule of Civil Procedure 72(b); and Rule 6.02 of the Local Rules of the Middle District of Florida. On May 4, 2001, Judge Moody recused himself, and the case was reassigned to this Court. (Dkt.Nos.27–28).

After considering the parties' submissions and oral arguments, Judge Jenkins filed a Report and Recommendation (R & R) on October 17, 2001, wherein she recommends that this Court deny Plaintiffs' motion. Judge Jenkins determined that Plaintiffs are not likely to succeed on the merits of their copyright infringement claim; that they are likely to succeed on the merits of their claims against Defendant Vincent for trade secret misappropriation and breach of the confidentiality agreement; that Plaintiffs are unlikely to succeed on the merits of their claims against Defendant Jerger for breach of the confidentiality agreement and duty of loyalty; that they are unlikely to succeed on the merits of their claims against Defendant Westpoint and Defendant Jerger for trade secret misappropriation; that Plaintiffs have not demonstrated that they will be irreparably harmed if injunctive relief is not granted; and, finally, that they have not demonstrated that the harm that they would suffer outweighs the harm that Defendants would suffer if injunctive relief was granted.

On November 5, 2001, Plaintiffs filed their Objections to Report and Recommendation (Dkt. No. 80), and on January 24, 2002, they filed Amended Objections to Report and Recommendation (Dkt. No. 88). Additionally, Defendants filed their Objections to Magistrate's Report and Recommendation (Dkt. No. 79) on November 5, 2002. After reviewing Judge Jenkins' findings in light of Plaintiffs' amended objections and Defendants' objections, this Court agrees with Judge Jenkins' rec-

ommendation that Plaintiffs' motion for injunctive relief be denied.

### Factual Background[1]

The Jerger Company, a Florida insurance company, founded in 1946 and owned until 1999 by the Jerger family, introduced the first homeowners' policy for mobile homes in Florida in 1964 and eventually became a niche insurance company in the mobile-home market. The Jerger family founded Mobile Homeowners Insurance Agencies (Plaintiff MHIA) in 1964 as a licensed Florida managing general agency (MGA) and provided the operational support for The Jerger Company's personal lines product.

In July 1999, the Philadelphia Insurance Companies acquired The Jerger Company, Plaintiff MHIA, and other affiliated companies that the Jerger family owned, including the intellectual property of The Jerger Company. On March 10, 2000, The Jerger Company changed its name to Liberty American Insurance Group. On March 31, 2000, Defendant Jerger resigned from Liberty American and participated in the startup of Westpoint Underwriters, L.L.C., a MGA for Modern Service Insurance Company (Modern), a Minnesota insurance company that was about to start doing business in Florida.

Plaintiff Liberty American developed rating software in 1998, and the leading employee in its development was Defendant Vincent. Plaintiff Liberty American is the owner of the copyright in its software and has received copyright registration for four key aspects of its software that Defendant Vincent developed: Rating Engine, registration number TXU945848; the Glossary of Terms, registration num-

ber TXU945849; the Javascripts used to operate the Rating Engine, registration number TXU945850; and the HTML generator that operates the website, registration number TXU945851. Liberty American required all of its employees to sign confidentiality agreements to protect the confidentiality and secrecy of its software.

Defendant Vincent left Liberty American on April 7, 2000 and eventually began working for Defendant Westpoint. On March 15, 2001, Plaintiffs filed suit against Defendants, alleging copyright infringement, misappropriation of trade secrets, and breach of the confidentiality agreements and duties of loyalty. They also filed a motion for preliminary injunction, requesting that Defendants Jerger and Vincent be enjoined from working for Defendant Westpoint and requesting that Defendant Westpoint discontinue use of its rating software.

### Review of Report and Recommendation

This Court must first determine the standard to be applied in reviewing the magistrate judge's findings of fact and law. Under the appropriate standard, this Court must then review: (1) the law that the magistrate judge followed in recommending to grant or deny the motion for preliminary injunction; (2) the law that the magistrate judge followed which forms the basis of the cause of action; and (3) the magistrate judge's findings in light of Plaintiffs' and Defendants' objections.

#### A. *Standard of Review*

■ Under the Federal Magistrate's Act, Congress vested Article III judges with the power to authorize a United States Magistrate Judge to conduct evi-

---

1. Although this Court adopts the Magistrate Judge's Report and Recommendation, a summary of the facts and issues in this case is presented for the benefit of the reader. They are not intended to replace, modify, or sup-

plement the findings of the Report and Recommendation; however, this Court's modifications of the factual findings in the R & R are found in parts C, D, and E of this Order.

dentiary hearings. 28 U.S.C. § 636. A district court judge may designate a United States Magistrate Judge to conduct hearings, including evidentiary hearings, in order to submit proposed findings of fact and recommendations (R & R) for the disposition of motions for injunctive relief. *Id.* § 636(b)(1)(B). Within ten days after being served with a copy of the R & R, any party may file written objections to the proposed findings and recommendations. *Id.* When a timely objection is made, the determination is subject to a *de novo* review by the district court. However, the district court will review those portions of the R & R that are not objected under a clearly erroneous standard. *Gropp v. United Airlines, Inc.*, 817 F.Supp. 1558 (M.D.Fla.1993); *see Thomas v. Arn*, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) (holding that the *de novo* standard of review applies to both a factual and legal conclusions to which a party objects).

**B.  *Preliminary Injunction***

■  In determining whether a preliminary injunction should be granted, the Court must look at four factors: 1) whether a substantial likelihood exists that the movant will ultimately prevail on the merits; 2) whether the movant will suffer irreparable injury if the injunction is not issued; 3) whether the threatened injury to the movant outweighs the potential harm to the opposing party; and 4) whether the injunction, if issued, would be adverse to the public interest. *Chase Manhattan Bank v. Dime Savings Bank of New York*, 961 F.Supp. 275, 276 (M.D.Fla. 1997) (quoting *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561 (11th Cir.1989)).

■  The plaintiff has the burden of persuasion as to each of these four factors. Failure to sustain this burden with regard to any one of these elements will cause the motion to be denied. *U.S. v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983). The issuance of the injunction is within the discretion of the trial court and is an "extraordinary and drastic remedy" not to be granted unless the movant clearly carries the burden of persuasion on all four factors. *Gibson v. Lee County Sch. Bd.*, 1 F.Supp.2d 1426, 1427 (M.D.Fla.1998) (citing *U.S. v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983) (quoting *Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974))).

In this case, Judge Jenkins found that: (1) Plaintiffs are not likely to succeed on the merits of their copyright infringement claim, their claim against Defendant Jerger for breach of the confidentiality agreement and duty of loyalty, or their claims against Defendant Westpoint and Defendant Jerger for trade secret misappropriation; (2) they are likely to succeed on the merits of their claims against Defendant Vincent for trade secret misappropriation and breach of the confidentiality agreement; (3) Plaintiffs have not demonstrated that they will suffer irreparable harm if a preliminary injunction is not granted; and (4) they have failed to show that the harm in which they will suffer if injunctive relief is not granted outweighs the harm that Defendant Vincent and Defendant Jerger will suffer if they are forced to stop working for Defendant Westpoint or that Defendant Westpoint will suffer if it is forced to discontinue use of its rating software.

**C.  *Plaintiffs' Objections to Factual Findings***

Plaintiffs have alleged that Defendants infringed on Plaintiff Liberty American's copyright for its rating software; that Defendants misappropriated Plaintiff Liberty American's trade secrets relating to its rating software and park data files; and that Defendant Jerger and Defendant

Vincent breached their confidentiality agreements and their duties of loyalty to Plaintiff Liberty American. Judge Jenkins issued a R & R in which she recommends that this Court deny Plaintiffs' motion for preliminary injunction.

Pursuant to Rule 72(b), Plaintiffs have filed timely objections to twenty-seven of Judge Jenkins' factual findings. Plaintiffs ask this Court to reject the R & R. Below are the findings to which Plaintiffs have objected and a summary of their review:

1. Defendant Westpoint, a Florida limited liability corporation, was incorporated in March 2000. (R & R, p. ——; Pls' Objections, p. 2).

In their first objection, Plaintiffs argue that finding number six should be amended to reflect that Defendant Westpoint filed its incorporation papers on March 22, 2000. However, in finding number thirty, the R & R reflects the exact date that Plaintiffs request finding number six to reflect; therefore, the Court finds that there is no reason to disturb Judge Jenkins' finding as to this point, and Plaintiffs' objection to finding number six is overruled.

2. Both Jerger and Vincent were formerly employed by The Jerger Company and Liberty American. Vatter has never been employed by either of those companies. (R & R, p. ——; Pls' Objections, p. 2).

Next, Plaintiffs argue that finding number eight omits uncontroverted evidence and is misleading as stated. Plaintiffs assert that Defendant Vatter had a close business relationship with Plaintiff Liberty American and that Plaintiff Liberty American served as the MGA for Defendant Vatter's former employer, Jefferson Insurance Company. As such, Plaintiffs request this Court to amend finding number eight to reflect that information.

The Court does not find that this factual finding is misleading. Rather, the evidence shows, as stated, that Defendants Vincent and Jerger were employed by both Liberty American and The Jerger Company and, additionally, that Defendant Vatter did not work for either of these companies. Defendants point out, and this Court agrees, that Plaintiffs' requested modifications are not supported by the evidence and constitute an attempt to reargue inferences that were properly made by Judge Jenkins. Therefore, the Court finds that the record supports Judge Jenkins' findings and Plaintiffs' objection is overruled.

3. The rating software automates what had previously been a time and labor-intensive mathematical operation. In the past, agents calculated insurance rates using paper, pencil, and a calculator, a task which might take five to ten minutes. Using the rating software, however, agents and customers are able to insert basic personal and demographic information into the data fields to obtain within seconds a customized rate quote using the insurance company's publicly filed rates and forms. For an insurance company that uses the internet, applicants for insurance can directly access this information. (R & R, p. ——; Pls' Objections, p. 2).

Plaintiffs argue that finding number twenty-one misconstrues the testimony in the record with respect to the users of Plaintiff Liberty American's software system, and they assert that the last sentence should be deleted because agents, not individual insurance customers, use the internet rating software. Likewise, they argue that the applicants themselves cannot access either their "basic personal and demographic information," "a customized rate quote," or "publicly filed rates and forms;" only Plaintiff Liberty American's agents can access such information. Therefore,

Plaintiffs assert that the Court should amend finding number twenty-one to reflect this information.

In response, Defendants argue that this finding is not necessary for the legal analysis that Judge Jenkins engaged in nor is it necessary for this Court's review. The Court agrees and finds that the evidence supports the facts as set forth in the R & R, and Plaintiffs' objection is overruled.

4. To assist its agents in writing policies and to streamline the rating process for mobile-home insurance, The Jerger Company and then Liberty American, its successor, also developed a mobile-home park list and park data file. Initially stored in multiple binders, this information was ultimately included in the company's database for use in conjunction with the rating software. (R & R, p. ——; Pls' Objections, p. 2–3).

As to finding number twenty-two, Plaintiffs allege that it misstates the evidence regarding the purpose of the park data because Plaintiff Liberty American does not use its park data to assist agents per se; rather, the primary purpose of the park data is for underwriting. Plaintiffs also assert that this finding omits uncontroverted evidence of Defendant Vatter's motive for secretly taking copies of Plaintiff Liberty American's park list with him when he left Jefferson for the already formed Defendant Westpoint.

The Court finds that the R & R correctly reflects the record evidence. Plaintiffs' request to amend the finding to include Defendant Vatter's motive is unnecessary, and it would require the Court to make inferences which Judge Jenkins was in a more appropriate position to make. As such, the Court agrees with Judge Jenkins and overrules Plaintiffs' objection to finding number twenty-two.

5. The park list contains the name and addresses of the mobile-home park, the number of units in the park, the type of park (adult or family), and the park's proximity to water, among other information. The park data file includes additional information, such as the number of insured units and whether the park has reached the "saturation point" in terms of new policies and risk allocation. (R & R, p. ——; Pls' Objections, p. 3).

Plaintiffs object to finding number twenty-three because they allege that it does not contain all of the information that the park data file contains and, as a result, it leads to an improper inference that all of the information that Plaintiff Liberty American keeps as its confidential compilation of park data is publicly available. Instead, Plaintiffs claim that, because the park data file contains information that the public cannot easily obtain, this factual finding should reflect all of the information that Plaintiff Liberty American's park data file contains.

The Court overrules Plaintiffs' objection to finding number twenty-three. The finding specifically states that the park list contains "other information" in addition to that information which is listed. Moreover, the evidence supports a finding that Plaintiffs did not treat this information as confidential, and that information, such as that contained in the park lists, is commonly shared in the industry. Finally, the evidence established that the information was available through a variety of public sources. Plaintiffs' request to amend this finding seems to be based on their objection to Judge Jenkins' conclusion that their park list and park data file are not trade secrets. Even if finding number twenty-three was amended to include the information that Plaintiffs request, this Court still finds that the park lists are not trade secrets. *See infra* pt. (E)(1)(b). There-

fore, the Court finds no reason to disturb finding number twenty-three of the R & R, and Plaintiffs' objection is overruled.

6. The information in the park list and park data file was compiled either from public records or from on-site visits by company employees, agents, and inspectors. It is updated as new information becomes available. (R & R, p. ——; Pls' Objections, p. 3).

In Plaintiffs' sixth objection, they argue that finding number twenty-four is incorrect because it states that agents performed on-site visits to gather park data, but the evidence shows that only Liberty American employees or independent inspectors conducted on-site inspections. In reviewing the transcript of the hearing before Judge Jenkins, and reviewing the record as a whole, this Court finds that the evidence supports Judge Jenkins' finding, and Plaintiffs' objection is overruled.

7. Liberty American has shared its park file and park data file with other independent agents on occasion, including Jefferson Insurance. (R & R, p. ——; Pls' Objections, p. 3).

Plaintiffs object to finding number twenty-six because they allege that it is inconsistent with finding number twenty-five and because it mistakenly infers that Plaintiff Liberty American treated its park list differently from its source code. Finally, Plaintiffs argue that there is no evidence that Plaintiff Liberty American shared its park data files with independent agents or with Jefferson; rather, Plaintiffs assert that the park data files were not authorized to be shared outside of the company. Plaintiffs ask this Court to strike finding number twenty-six in its entirety or to find that Plaintiff Liberty American takes reasonable precautions to keep its confidential park data out of its competitors' hands, absent contractual confidentiality protections.

The Court finds that finding number twenty-six is not inconsistent with finding number twenty-five because finding number twenty-five deals with Plaintiffs' actions regarding their software, not their park list or park data file as mentioned in finding twenty-six. Therefore, for the reasons that this Court overruled objection number five above, the Court agrees with Judge Jenkins proposed findings as to number twenty-six and overrules Plaintiffs' objection.

8. Prior to offering mobile-home insurance in California, Liberty American obtained a California park list from an outside source and used it to develop its park list. (R & R, p. ——; Pls' Objections, p. 4).

Next, Plaintiffs object to finding number twenty-seven because they claim that it is irrelevant. Plaintiffs argue that there is no testimony that reflects that the California list played any part in the development of Plaintiff Liberty American's Florida park list, and they ask this Court to strike finding number twenty-seven in its entirety. Defendants argue that this finding is relevant to support the proposition that Plaintiff Liberty American did not believe that the park list information was confidential. The Court agrees with Defendants and overrules Plaintiffs' objection to finding number twenty-seven.

9. Sometime between December 1999 and February 2000, John Jerger had initial communications with Doug Vatter, then a vice president at Jefferson, relating to the formation of a company to sell mobile-home insurance in Florida. At the time of this initial contact, Vatter already had investors for the new venture.

Jerger and Vatter had further communications over the next weeks

about the new company to be known as Westpoint.

Westpoint filed Articles of Organization as a limited liability company with the Florida Department of State on March 22, 2000.

John Jerger resigned from Liberty American on March 31, 2000 and began employment with Westpoint in April 2000.

Jerger testified that he did not take any Liberty American software, park information, or other confidential information when he left the company. (R & R, p. ——; Pls' Objections, p. 4).

Plaintiffs object to findings twenty-eight through thirty-two because they claim that the findings omit a significant number of uncontroverted facts, including key admissions regarding the extent of Defendant Jerger's competitive activities during his employment with Plaintiff Liberty American. Additionally, Plaintiffs argue that, during his employment, Defendant Jerger used Liberty American's confidential information and resources to prepare business proposals and presentations for a competing entity and then took that information with him when he resigned. For these reasons, Plaintiffs request the Court to reject findings twenty-eight to thirty-two of the R & R.

This objection, in part, goes to the credibility of Defendant Jerger. Judge Jenkins was present for all of the testimony that was given at the evidentiary hearing, and she found that the evidence supporting Defendant Jerger's denial as to whether he engaged in any competitive activity in violation of his confidentiality agreement or duty of loyalty was credible. Moreover, Judge Jenkins found, after considering all of the evidence, that there was no evidence to dispute Defendant Jerger's claim that he did not take any information or software from Plaintiff Liberty American when he left. Finally, the record supports the other factual findings contained in this objection. For these reasons, the Court adopts findings twenty-eight through thirty-two and overrules Plaintiffs' objection to these findings.

10.  Shortly after The Jerger Company merged with Liberty American, Vincent began looking for other job opportunities. He took a trip to Montana with John Auer ("Auer"), President of American Strategic Insurance Company ("ASI"). While there, Vincent met with Ed Holt ("Holt"), Vice President of Information Services for National Flood Services ("NFS"), a Montana corporation. After their initial introduction, Vincent had several discussions with Holt regarding Vincent's ability to design a software application that would process homeowners insurance. (R & R, p. ——; Pls' Objections, p. 4).

Plaintiffs argue that finding number thirty-three is incomplete because it omits Defendant Vincent's admission that, while still employed at Liberty American and without permission to do so, he emailed a flow chart using Plaintiff Liberty American's confidential information to show NFS how a MGA's software system could work. Defendants argue that there was no substantial evidence presented that Defendant Vincent needed permission to discuss future employment with Auer, nor was there evidence to support that the flow chart was confidential.

As to this objection, the Court finds that the evidence in the record supports Judge Jenkins' finding. Plaintiffs' objection and amendment asks this Court to make inferences that the evidence presented at the hearing does not support—a task this Court is unwilling to do. Therefore, Plaintiffs' objection to finding number thirty-three is overruled.

11. After Vincent had an unexcused absence from work on or about April 7, 2000, Liberty American terminated Vincent and locked him out of the computer system. That same day, Vincent resigned from Liberty American, effective April 21, 2000. He did not tell anyone at Liberty American that he was in possession of Liberty American software. (R & R, p. ——; Pls' Objections, p. 5).

Next, Plaintiffs object to finding number thirty-six because they claim that Plaintiff Liberty American never terminated Defendant Vincent. Defendants argue that there was evidence to find that Defendant Vincent was terminated. However, they admit that Defendant Vincent continued to work for Liberty American for two weeks after his alleged termination.

Defendants also object to this finding because they argue that it led the Court to the erroneous conclusion that Defendant Vincent improperly took and used Liberty American software after his departure from the company. Defendants argue that although Defendant Vincent resigned on April 7, 2000, his resignation was not effective until April 21, 2000, and he was instructed to work at home during those two weeks. They also argue that there was no evidence presented that Defendant Vincent maintained access to Plaintiff Liberty American's rating engine or the HTML generator source code.

The Court finds that there is no evidence to support the finding that Liberty American terminated Vincent. The record shows that he resigned on April 7, 2000 and continued to work for Liberty American from home until his resignation was effective on April 22, 2000. Therefore, the Court finds that the portion of finding number thirty-six referring to Vincent's termination shall be stricken. However, the Court finds that there is ample evidence to support the remainder of the factual statements set forth in finding number thirty-six and both Plaintiffs' and Defendants' objections are overruled.

12. Vincent began working with NFS immediately after resigning from Liberty American. (R & R, p. ——; Pls' Objections, p. 5).

As to finding number thirty-seven, Plaintiffs assert that the evidence shows that Defendant Vincent began working for NFS before his resignation from Liberty American took effect. The Court finds that Plaintiffs' objection involves mere semantics. The evidence shows that Defendant Vincent's contract with NFS lists his starting date as April 17, 2000. This is both "immediately after resigning" on April 7, 2000, as stated in the R & R and "before his resignation from Liberty American took effect" on April 21, 2000, as Plaintiffs request the finding to reflect. Because the evidence supports the findings as contained in the R & R, Plaintiffs' objection is overruled. Additionally, although Defendants object to this finding, they fail to set forth reasons for their objection; therefore, Defendants' objection is overruled.

13. NFS hired Vincent for his programming skills, his knowledge of the homeowners insurance industry and of ASI's processing methodologies, as NFS hoped to obtain business from ASI once a computer program was written to accommodate ASI's needs. (R & R, p. ——; Pls' Objections, p. 5).

Plaintiffs contend that finding number thirty-eight fails to reflect uncontroverted testimony that Defendant Vincent's knowledge of the homeowners insurance industry and of ASI's processing methodologies, as well as a significant percentage of his programming skills, were obtained and developed exclusively through Defendant

Vincent's employment with Plaintiff Liberty American and its predecessor, The Jerger Company. Defendants argue that Defendant Vincent's general background and level of skill are irrelevant to this matter. This Court agrees with Defendants that the information that Plaintiffs seek to add is unnecessary and irrelevant. The evidence supports the facts as set out in the R & R; therefore, Plaintiffs' objection to finding number thirty-eight is overruled.

14. Vincent was paid for several months of work on the rating engine and related software for NFS. During this time he had access to the Liberty American rating engine and HTML Generator source code. Although he used a different language for the NFS source code, the variables were very similar to those in Liberty American's source code. Vincent had a strong incentive to use Liberty American's source code because he was hired to write a program that would enable NFS to obtain ASI's business from Liberty American. (R & R, p. ——; Pls' Objections, p. 5).

Plaintiffs object to finding number forty because they allege that there is no evidence in the record to support a finding that Defendant Vincent wrote the NFS rating engine or the HTML generator source code in a different language than the language that Plaintiff Liberty American used in its system. Further, they argue that there is no evidence that Defendant Vincent wrote Defendant Westpoint's rating engine or HTML generator source code in a different language. Finally, Plaintiffs argue that this finding confuses the rating engine and the HTML generator source code; therefore, the Court should strike the clause "Although he used a different language for the NFS source code."

Defendants also object to this finding because they argue that their expert's testimony, stating that the design of Defendant Westpoint's software was significantly different, was met with no credible challenge, and as such, the implication that Defendant Vincent had an incentive to use Plaintiff Liberty American's code was clearly erroneous. In their response to Plaintiffs' objections, Defendants note that the facts contained in finding number forty are not necessary for the legal analysis engaged in by Judge Jenkins or for the review required of this Court. Because the Court agrees with Defendants on this point, Judge Jenkins' findings will not be disturbed, and both Plaintiffs' and Defendants' objections to finding number forty are overruled.

15. Westpoint had a meeting with Modern Service Insurance Company ("Modern"), around Memorial Day 2000.

In July 2000, Modern agreed to write mobile-home insurance in Florida with Westpoint as its MGA.

Westpoint submitted its proposed rate filing with the Florida Department of Insurance on or about August 7, 2000. On July 14, 2000, Westpoint hired Vincent to oversee the technology side of Westpoint's business, specifically to write rating engine and related software applications. Although Westpoint. considered out-sourcing this work, or using third party vendor software, it concluded that Vincent's experience writing rating engine software would be best for the company. (R & R, p. ——; Pls' Objections, p. 5–6).

Plaintiffs claim that findings forty-one through forty-four omit several important admissions, including that Defendants Jerger and Vincent used Plaintiff Liberty American's confidential information in pre-

sentations to potential business partners and reinsurers.

The Court agrees with the findings as set forth in the R & R. Judge Jenkins was present to receive testimony and evaluate the credibility of the witnesses. As such, she was in an appropriate position to draw inferences from that testimony. Therefore, this Court adopts her findings set forth in numbers forty-one through forty-four and overrules Plaintiffs' objection.

16. Vatter, Westpoint's president, stated that he told Vincent to write a system "from scratch." (R & R, p. ——; Pls' Objections, p. 6).

Plaintiffs' claim that no evidence in the record supports finding number forty-seven because Defendant Vatter testified that he was "looking for someone who could draw ... something from scratch" and that he expected to benefit from Defendant Vincent's work for Plaintiff Liberty American; therefore, Plaintiffs ask this Court to strike finding number forty-seven. As stated above, the Court finds that the evidence in the record supports Judge Jenkins' finding as to this point. Therefore, Plaintiffs' objection to this point is overruled.

17. Westpoint also created a park list and park data file from various sources to be used with the rating engine. Most of the information came from the internet. Vatter, who used to work for Jefferson Insurance, had a copy of the park information that Liberty American provided to his company when he worked there. This information was also used to create Westpoint's park list.

Jerger, Vincent, and Vatter, with the assistance of perhaps one or two others, completed the park list and park data file for Westpoint in one or two days. (R & R, p. ——; Pls' Objections, p. 6).

Additionally, Plaintiffs request that this Court amend findings forty-eight and forty-nine because they omit uncontroverted evidence. Moreover, they argue that the omission of this evidence leads to the inference that "the creation of Westpoint's park list was innocuous." Plaintiffs also argue that Defendants Vatter, Jerger, and Vincent copied Plaintiff Liberty American's park list, thereby allowing them to create Defendant Westpoint's park list in two days with twenty percent of the list copied directly from Plaintiff Liberty American's park list.

As this Court stated above in reference to Plaintiff Liberty American's park list, the record supports that these lists are not trade secrets; that Liberty American did not keep the lists confidential; and that the lists contain information that is publicly available. As such, the Court adopts Judge Jenkins' findings, and Plaintiffs' objection is overruled.

18. Mark Stutzbach ("Stutzbach"), Liberty American's expert witness, compared Liberty American's and Westpoint's rating engine and HTML Generator source code. He concluded that substantial parts of Westpoint's code, both old and new, were derived from Liberty American's code, and some parts were directly copied. He opined that it would be "very unlikely" that two programmers would use identical code. Stutzbach acknowledged that if two programmers were asked to write code for an arithmetic function, he would expect the code to be "similar" but not identical.

Dr. Gwendolyn Walton ("Walton") testified for Westpoint. She opined that "there are significant differences between the Liberty American code and the Westpoint code, both old and new versions." Walton agreed with Plain-

tiff's expert that certain lines of code are identical, but she disagreed with his conclusion. Walton explained that "[t]here is lots of identical code in here. But there has got to be in order for them to do what they are doing." She also disagreed with Stutzbach's observation that programmers are highly individualistic in writing code. (R & R, p. ——; Pls' Objections, p. 7).

Finally, Plaintiffs object to findings fifty-two and fifty-three because they claim that the findings fail to take into account all of the experts' testimony and reports. Plaintiffs ask this Court to amend findings fifty-two and fifty-three to accurately reflect the experts' testimony and reports.

Again, this Court points out that Judge Jenkins was present to hear the parties' experts' testimony and, as such, was in a more appropriate position than this Court to weigh the credibility of each expert. Therefore, the Court adopts Judge Jenkins' findings and overrules Plaintiffs' objection to findings fifty-two and fifty-three.

### D. *Defendants' Objections to Factual Findings*

Defendants agree with the results that Judge Jenkins reached in her R & R; however, they have objected to seven of Judge Jenkins' factual findings. Below are the findings to which Defendants have objected and a summary of their review:

1. Liberty American takes reasonable precautions to keep its proprietary software out of its competitors' hands (absent a licensing agreement) and to prevent its employees from doing the same. Liberty American maintains a secured computer system, allowing only senior management or members of its IT department to access its source code. Employees privy to sensitive or proprietary information are re-

quired to sign confidentiality agreements. Companies with whom Liberty American does business are required to sign licensing agreements. (R & R, p. ——; Defs' Objections, p. 2).

Defendants object to finding number twenty-five because they claim that the evidence presented at the hearing was insufficient to determine that Plaintiff Liberty American took reasonable precautions to keep its proprietary software out of competitors' hands. Therefore, Defendants request that this Court reject finding number twenty-five.

As pointed out in the R & R, Plaintiff Liberty American takes reasonable efforts to maintain its secrecy by restricting access of its computer system to its programmers and to third parties who have licensing agreements with Plaintiff Liberty American. Further, Plaintiff Liberty American requires key employees with access to the software to sign confidentiality agreements. Therefore, the Court finds that Judge Jenkins' finding was supported by the evidence in the record and overrules Defendants' objection.

2. Also in March of 2000, Vincent downloaded onto John Auer's laptop Liberty American's software, including the source code, and the database from Liberty American's main computer which included the park file and park data file. He later transferred this information to his personal computer.

Although Liberty American programmers and other IT employees were allowed to use the proprietary software when they worked from home or when assisting clients or others with whom they had contractual relations, Vincent did not relinquish possession of Liberty American's software, including source code, and its database

when he left Liberty American the following month. (R & R, p. —— ——; Defs' Objections, p. 3).

Defendants object to findings thirty-four and thirty-five because they argue that these findings led the Court to the erroneous conclusion that Defendant Vincent improperly took and used Liberty American's software after his departure from the company. After hearing Defendant Vincent's testimony, Judge Jenkins concluded that Defendant Vincent was not credible and that he likely copied or used Plaintiff Liberty American's source code in writing the rating engine for Defendant Westpoint. Therefore, the Court finds that findings thirty-four and thirty-five are adequately supported by the evidence in the record and overrules Defendants' objection.

Defendants also object to findings thirty-six, thirty-seven, and forty. The Court's discussion as to Defendants' objections for these findings is stated in Plaintiffs' objections, numbers eleven, twelve, and fourteen.

3. In July 2000, Sean McVeigh ("McVeigh"), who became Liberty American's IT director after Vincent left, accessed Westpoint's File Transfer Protocol (FTP) site and downloaded three files, including the source code. McVeigh was surprised that Westpoint's FTP site was not password-protected. McVeigh did not alter the files he downloaded and he turned them over to Liberty American's president, Dan Eldridge. (R & R, p. ——— – ——; Defs' Objections, p. 8).

Defendants object to the last sentence in finding number fifty because they claim that it disregards an important deficiency in the chain of custody for the files that McVeigh allegedly downloaded from Westpoint's FTP site. Defendants assert that there is no adequate foundation to support any finding that the files that McVeigh

downloaded had not been altered, and they request that this Court amend finding number fifty, omitting the last sentence. However, Defendants also concede that this finding has no effect on the substantive analysis of the claim. Therefore, the Court finds no reason to disturb Judge Jenkins' findings as to number fifty and Defendants' objection is overruled.

This Court has reviewed the remainder of the findings of fact proposed in the R & R and finds them supported by the record evidence.

### E. Plaintiffs' Objections to Conclusions of Law

Plaintiffs also object to nine of Judge Jenkins' conclusions of law. Below are the conclusions to which Plaintiffs have objected and a summary of their review:

### 1. Misappropriation of Trade Secrets

Plaintiffs argue that the Court erroneously concluded that Defendants Jerger and Westpoint were not liable for Defendant Vincent's misappropriation of trade secrets and that Plaintiff Liberty American's park data file failed to rise to the level of a trade secret.

The Florida Uniform Trade Secrets Act permits injunctive relief to redress any actual or threatened misappropriation of trade secrets. Fla. Stat. § 688.001, *et seq.*; *see Thomas v. Alloy Fasteners*, 664 So.2d 59, 59 (Fla.App. 5th 1995) (holding that the Uniform Trade Secrets Act specifically provides for injunctive relief against actual or threatened trade secrets that may not yet have been disclosed). Section 688.002 of the Act broadly defines "trade secret" as:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) [d]erives independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

■ This Court adopts Judge Jenkins' conclusion that Plaintiff Liberty American's rating software is a trade secret under Florida law. As pointed out in the R & R, the rating software, including the source code, has independent economic value because it is not readily known or readily ascertainable by other persons who could derive economic value from its disclosure. Additionally, Plaintiff Liberty American takes reasonable efforts to maintain its secrecy by restricting access to its programmers and to third parties who have licensing agreements with Plaintiff Liberty American. Further, Plaintiff Liberty American requires key employees who have access to the software to sign confidentiality agreements.

### a. Defendant Westpoint's Liability for Defendant Vincent's Misappropriation of Trade Secrets

■ Judge Jenkins concluded that the evidence did not demonstrate a reasonable likelihood of success on Plaintiffs' claim that Defendant Westpoint misappropriated their trade secrets because there was no direct evidence that Defendant Westpoint, Defendant Jerger, or Defendant Vatter knew that Defendant Vincent retained possession of Plaintiff Liberty American's source code when Defendant Vincent left that company or that he would have used it in creating the program for NFS or Defendant Westpoint. Moreover, as to Plaintiff Liberty American's park lists and park data files, Judge Jenkins pointed out that Defendant Westpoint's park files were developed through information available on

the internet and that only twenty percent were from those park lists that Defendant Vatter had when he worked for Jefferson. Therefore, she concluded that Plaintiffs did not demonstrate a reasonable likelihood of success on their misappropriation claim.

Plaintiffs argue that Defendant Vincent's misappropriation should be imputed to Defendant Westpoint because Defendant Westpoint was fully aware of Defendant Vincent's role in the development of the source code at Plaintiff Liberty American. Additionally, Plaintiffs argue that, because Defendant Vincent's misappropriation was used to and for its unfair competitive advantage, the misappropriation should be imputed to Defendant Westpoint.

This Court agrees with Judge Jenkins' conclusion that there was insufficient evidence to support Plaintiffs' claims that Defendant Westpoint knew or had reason to know that Defendant Vincent used Plaintiff Liberty American's source code to create Defendant Westpoint's rating product. Moreover, Judge Jenkins concluded that there was no direct evidence that either Defendant Jerger or Vatter knew that Defendant Vincent retained possession of Plaintiff Liberty American's source code when he left Liberty American or that he would have used it in creating the product for Defendants. As such, this Court does not find that Defendant Vincent's misappropriation of Plaintiffs' trade secrets is imputed to Defendant Westpoint and Plaintiffs' objection is overruled.

### b. Plaintiff Liberty American's Park Data

■ The R & R also concluded that Plaintiff Liberty American's park list and park data file were not trade secrets, and, therefore, Defendants could not misappro-

priate their trade secrets. As Judge Jenkins pointed out:

> Although the list took considerable time to compile, Liberty American has not shown a reasonable likelihood that the park file and park data file contain information not readily available to the public and thus meet the definition of trade secret under Florida law.

(R & R, p. ——–——) (citations omitted). Plaintiffs do not dispute that Plaintiff Liberty American's park lists and park data files contain some publicly-available information; however, Plaintiffs argue that the use of public information does not rule out trade secret protection.

The Court does not agree. As stated above, a trade secret must consist of information that derives economic value from *not* being readily ascertainable by others. Fla. Stat. § 688.002(4). The park list and park data file did not derive economic value because they were not readily ascertainable by others; rather, the information that the park list and park data file contained consisted of publicly-available information, as well as information that could be observed by a visitor to any of the parks. Defendant Westpoint presented evidence that it compiled its own list in two days, a fact which leads this Court to the conclusion that the information was easily obtainable.

Additionally, to qualify as a trade secret under Florida law, the information must be the subject of reasonable efforts to maintain it secrecy. Fla. Stat. § 688.002(4). Again, because of the public nature of the information contained in the park list and park data file, Plaintiffs cannot contend that this information was the subject of secrecy. Moreover, the evidence presented at the evidentiary hearing shows that Plaintiffs shared their park list and park data file with others, and they used a California park list in compiling their own park list. As such, Plaintiffs cannot maintain that they took reasonable efforts to protect the secrecy of their park list and park data file.

Because Plaintiffs failed to demonstrate both that the specific information they seek to protect is secret and that it takes reasonable steps to protect its secrecy, the Court finds that the park list and park data file are not trade secrets and overrules Plaintiffs objection.

### c. Defendant Jerger's Misappropriation of Trade Secrets

█ Judge Jenkins concluded that Defendant Jerger was not liable for Defendant Vincent's misappropriation of Plaintiffs' trade secrets because there was no direct evidence that Defendant Jerger knew that Defendant Vincent retained possession of Plaintiff Liberty American's source code when he left that company or that he would have used it in creating the program for NFS or Defendant Westpoint. Therefore, she concluded that Plaintiffs did not demonstrate a reasonable likelihood of success on their misappropriation claim against Defendant Jerger.

Plaintiffs assert that the close relationship between Defendant Jerger and Defendant Vincent; and the fact that Defendant Jerger hired Defendant Vincent to write Defendant Westpoint's software, was sufficient circumstantial evidence to conclude that Defendant Jerger should have known that using information from Defendant Vincent for the benefit of Defendant Westpoint was wrongful. Additionally, Plaintiffs argue that the R & R's proposed conclusion of law as to this point was erroneous because it failed to take into account the variety of trade secrets that Defendant Jerger individually misappropriated and/or used with the knowledge that he had obtained them improperly or from a party who had a duty to keep them confidential. Because the use of trade secret informa-

tion was for the benefit of Defendant Westpoint, Plaintiffs urge this Court to find that Defendant Jerger was liable for misappropriation of Plaintiff Liberty American's trade secrets and reject Judge Jenkins' conclusion of law as to this point.

The Court agrees with Judge Jenkins' conclusion that Defendant Jerger did not misappropriate Plaintiffs' trade secrets. Defendant Jerger denied taking any confidential information with him when he left his employment with Liberty American, and Plaintiffs failed to provide evidence in which Judge Jenkins could conclude that Defendant Jerger's denial was not credible. Moreover, a former employer cannot preclude an employee from utilizing expertise that he gained during his former employment. *Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288, 290 (Fla. App.2d 1989) (citing *Pure Foods, Inc. v. Sir Sirloin, Inc.*, 84 So.2d 51 (Fla.1955)). As such, it is unlikely that Plaintiffs can prevail on a misappropriation claim against Defendant Jerger; therefore, this Court adopts the conclusions set forth in the R & R and overrules Plaintiffs' objection.

### 2. Breach of Confidentiality Agreement and Duty of Loyalty

■ Next, the R & R concluded that, although Plaintiffs could show a reasonable likelihood of success on its claim that Defendant Vincent's retention and use of Plaintiff Liberty American's software breached his confidentiality agreement with Liberty American, Plaintiffs did not show a sufficient basis to hold Defendant Jerger liable for Defendant Vincent's actions; nor had they produced enough evidence to find that Defendant Jerger violated his confidentiality agreement or duty of loyalty towards Plaintiff Liberty American. Finally, the Court pointed out that Defendant Jerger denied taking or using any confidential information when he left Liberty American, and there was no evidence presented to discredit his denial.

This Court agrees with the conclusions that Judge Jenkins reached in her R & R. As the Florida Fifth District Court of Appeals pointed out:

> The general rule with regard to an employees' duty of loyalty to his employer is that an employee does not violate his duty of loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment. However, that employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment.

*Fish v. Adams*, 401 So.2d 843, 845 (Fla. App. 5th 1981) (citing *Field Servs., Inc. v. White & White Inspection & Audit Serv., Inc.*, 384 So.2d 303 (Fla.App. 5th 1980)). Defendant Jerger denied taking or using any confidential information from Liberty American when he left. As such, there is no evidence to show that he has breached any duties that he may have owed to Plaintiffs. Therefore, this Court overrules Plaintiffs' objection and adopts Judge Jenkins' conclusions, as stated in the R & R.

### 3. Copyright Infringement

Judge Jenkins found that Plaintiff Liberty American owned a valid copyright and that Plaintiffs made out a *prima facie* case of copying. However, Judge Jenkins found that Plaintiffs failed to provide sufficient evidence that Plaintiffs rating engine . or HTML generator were protectable. Therefore, Plaintiffs could not show a likelihood of success on the merits of their copyright infringement claim. Plaintiffs argue that this conclusion is a misapplication of the abstraction-filtration-comparison test and, under proper application of this test, Plaintiff Liberty American's soft-

ware is protectable and Defendants infringed on Plaintiffs' copyrights.

■■■■■ There are two elements to every claim of copyright infringement: (1) possession of a valid copyright; and (2) copying of those elements of work that are copyrightable. *Block State Testing Servs., L.P. v. Kontractor's Prep Corp.*, 4 F.Supp.2d 1365, 1366 (M.D.Fla.1997). Under the copyright laws, the registration of a copyright certificate constitutes *prima facie* evidence of the validity of a copyright in a judicial proceeding commenced within five years of the copyright's first publication. *Id.* (citing 17 U.S.C. § 410(c)). Accordingly, the certificate of copyright registration shifts the burden to the Defendant to prove the invalidity of the plaintiff's copyrights. *Id.* (citing *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668 (3d Cir.1990)). Copying is normally established by showing access and substantial similarity, but access can be presumed if there is "substantial similarity." *Kent v. Revere*, 229 U.S.P.Q. 828, 832 (M.D.Fla.1985).

To prove actionable copying, the plaintiff must first establish, as a factual matter, that the defendant "actually used the copyrighted material to create his own work." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir.1996) (quoting *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994)). To prove copying, Plaintiffs must show a substantial similarity between their rating software and Defendants' rating software, such that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir.2001) (quoting *Leigh v. Warner Bros., Inc.* 212 F.3d 1210, 1214 (11th Cir.2000) (quoting *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982))).

■■■■ The Copyright Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. Under this Act, the literal elements of computer programs—their source and object codes—are subject to copyright protection. *Computer Assoc. Intl., Inc. v. Altai, Inc.*, 982 F.2d 693, 702 (2d Cir.1992). Source code is a symbolic language that humans can read and object code is a translation of the source code into a series of zeros and ones that is readable by a computer. *Mitek Holdings, Inc. v. Arce Engineering Co.*, 89 F.3d 1548, 1556 n. 15 (11th Cir. 1996).

### The Abstraction–Filtration–Comparison Test

The Eleventh Circuit has adopted the abstraction-filtration-comparison test set forth in the Second Circuit Court of Appeals decision, *Computer Associates International, Incorporated v. Altai, Incorporated*, 982 F.2d 693 (2d Cir.1992). *Bateman*, 79 F.3d at 1545. The test enables a court to separate protectable expression from unprotected ideas when determining whether the nonliteral elements of two or more computer programs are substantially similar. *Id.*

In determining whether substantial similarity exists between two works, the court must first apply the "abstraction" portion of the test. As the Second Circuit pointed out:

> The abstractions test will comprise the first step in the examination for substantial similarity. Initially, in a manner that resembles reverse engineering on a theoretical plane, a court should dissect the allegedly copied program's structure and isolate each level of abstraction contained within it. The process begins

with the code and ends with an articulation of the program's ultimate function. *Altai*, 982 F.2d at 707.

Next, the court must examine "the structural components at each level of abstraction to determine whether their particular inclusion at that level was "idea" or was dictated by considerations of efficiency, so as to be necessarily incidental to that idea, required by factors external to the program itself, or taken from the public domain and therefore nonprotectable expression." *Altai*, 982 F.2d at 707. This step has been termed the "filtration" aspect of the test, and it defines the scope of the plaintiff's copyright by separating protectable expression from nonprotectable material. *Id.*

In filtering out the unoriginal elements contained in a copyrightable work, the court uses two separate doctrines: merger and *scenes a faire*. Under the merger doctrine, copyright protection is denied to expression that is inseparable from, or "merged" with the ideas, processes or discoveries underlying the expression. *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 838 (10th Cir.1993). Under the *scenes a faire* doctrine, copyright protection is denied to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting. It also denies copyright protection to those elements that have been dictated by external factors, such as hardware standard and mechanical specifications and computer industry programming practices. *Id.*

Plaintiffs argue that the Court's conclusion that Plaintiff Liberty American did not prove its copyright claim for failing to disprove that the merger and *scenes a faire* doctrines apply to elements of its protectable expression was an error because the Court placed the burden of proof on the wrong party. Because the merger

and *scenes a faire* doctrines are defenses to a claim of infringement, Plaintiffs argue that the Court should have placed the burden of proving the defenses on Defendant Westpoint, not on Plaintiff to disprove the defenses. However, the Eleventh Circuit, in *Bateman*, stated that,

[the court] express[es] no opinion as to whether it is better to consider [the merger and *scenes a faire* doctrines] as part of the filtration step or rather to consider them in a separate, yet parallel analysis. The important point here is that such an analysis is necessary—it makes little difference which methodology is employed .... [footnote omitted]. It is essential that ... the approaches adopted by the other circuits merely are a means to a very important end: filtering out all unprotectable material.

*Bateman*, 79 F.3d at 1545–1546. After examining the evidence and the R & R, the Court finds that Judge Jenkins correctly analyzed Plaintiffs' copyright claim under the filtration analysis using these doctrines. Plaintiffs have failed to provide this Court with case law providing that the merger and *scenes a faire* doctrines are affirmative defenses or that Defendants bore the burden of proof as to these issues. Additionally, the Court notes that it was unable to find case law that supported Plaintiffs' claims or disputed the findings of Judge Jenkins.

As Judge Jenkins pointed out, Plaintiffs failed to present a meaningful analysis of the protectability of its source code for the rating engine and the HTML generator. Because the burden of proof is on Plaintiff Liberty American to establish the likelihood of success on the merits of its copyright infringement claim, and Plaintiffs failed to establish the protectability of its source code, the Court agrees with Judge Jenkins' conclusions and adopts the R & R as to this point.

### 4. Irreparable Harm

■ Judge Jenkins found that Plaintiffs would not suffer irreparable harm if injunctive relief was not granted because Plaintiff Liberty American's president's testimony established that money damages could be quantified to redress Plaintiffs' injuries if Plaintiffs prevailed at trial. Plaintiffs argue that the Court's conclusion that Plaintiff Liberty American would not suffer irreparable harm was erroneous because the Court failed to take into consideration Plaintiff Liberty American's harm to its competitive edge that was lost through Defendants' misappropriation of trade secrets.

■ It is well-established that a preliminary injunction cannot be granted absent a showing of irreparable harm. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989). An injury is irreparable only if it cannot be undone through monetary remedies. *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir.1987) (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir.1983)).

The Court agrees with Judge Jenkins that Plaintiffs have failed to show irreparable harm. Here, money damages can redress Plaintiffs' injuries, should they prevail at trial. Plaintiffs' software is not so unique that money damages are inadequate. In fact, although the software could be found to be original, the purpose of the software is only to increase the speed of the calculations of a client's insurance rate, something that has been done in the industry for years. As such, the Court finds that Plaintiffs will not suffer irreparable harm if the preliminary injunction is not granted.

### 5. Balance of Hardships

Finally, the R & R concluded that Plaintiffs did not demonstrate that the hardship that it would suffer in the absence of an injunction would outweigh the hardship to Defendants Vincent and Jerger if they were prohibited from working for Defendant Westpoint and Defendant Westpoint was prohibited from using its rating software. Plaintiffs object to the Court's conclusion that the balance of hardships does not tip in Plaintiff Liberty American's favor, even if Plaintiff could show irreparable harm. However, this Court finds that because Plaintiffs cannot show irreparable harm, there is no need to address this argument, and Plaintiffs' objection is overruled. Accordingly, it is

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 2) be **DENIED**; Plaintiffs' Motion to Strike (Dkt. No. 89) be **DENIED**; Plaintiffs' Amended Objections to the Report and Recommendation (Dkt. No. 88) be **OVERRULED**; Defendants' Objections to the Report and Recommendation (Dkt. No. 79) be **OVERRULED**; and Judge Jenkins Report and Recommendation (Dkt. No. 75) be **ADOPTED**, except as to the modification to finding number thirty-six as explained above.

### *REPORT AND RECOMMENDATION*

JENKINS, United States Magistrate Judge.

THIS CAUSE comes on for consideration of **Plaintiff's Motion for Preliminary Injunction** (Dkt.2), and defendants' response in opposition (Dkts.49, 50), as well as the additional memoranda and submissions of the parties, including exhibits, deposition designations, and objections (Dkts.51–53, 55, 57–61, 64–70).[1]

---

1. The district court has referred this matter to the undersigned for consideration and a report and recommendation. *See* 28 U.S.C. § 636(b); Local Rule 6.01(a), M.D. Fla.

An evidentiary hearing has been held. The court has considered the evidence and argument of the parties and submits these findings of fact and conclusions of law.[2]

For the reasons stated herein, I recommend that the motion for preliminary injunctive relief be denied.

## FINDINGS OF FACT

The following facts are either undisputed or have been established by a preponderance of the credible evidence.

1. Plaintiff, Liberty American Insurance Group, Inc. ("Liberty American" or "plaintiff"), formerly The Jerger Company, is a Florida corporation which provides homeowners insurance and mobile-home insurance.

2. Plaintiff Mobile Homeowners Insurance Agencies ("MHIA") was founded in 1964 by the Jerger family as a licensed Florida Managing General Agency ("MGA"). MHIA provided the operational support for The Jerger Company's personal-lines product.[3]

3. The Jerger Company, a Florida insurance company founded in 1946 and owned, until 1999, by the Jerger family, introduced the first homeowners' policy for mobile homes in Florida in 1964 and eventually became a niche insurance company in the mobile-home market.

4. In July 1999, The Philadelphia Insurance Companies acquired The Jerger Company, MHIA, and other affiliated companies owned by the Jerger family, including the intellectual property of The Jerger Company. On March 10, 2000, The Jerger Company changed its name to Liberty American Insurance Group.[4]

5. P. Daniel Eldridge ("Eldridge") is the President of Liberty American.

6. Defendant Westpoint, a Florida limited liability corporation, was incorporated in March 2000.

7. Westpoint's President is Douglas Vatter ("Vatter"), who owns a thirty percent (30%) share in that company. Defendant John Jerger ("Jerger") is Chief Operations Officer and also owns a thirty percent (30%) share in Westpoint. Defendant Lyle Vincent ("Vincent") is Chief Information Officer. Several months after he started with the company, Vincent became a ten percent (10%) shareholder in Westpoint.

8. Both Jerger and Vincent were formerly employed by The Jerger Company and Liberty American. Vatter has never been employed by either of those companies.

9. Liberty American and Westpoint are competitors. Both companies sell mobile-home insurance policies in Florida.

*The Jerger Company/Liberty American*

10. Jerger, grandson of the founder, joined The Jerger Company in 1984 or 1985 as a file clerk in the mail room, took a full-time position in the information technology ("IT") department at The Jerger

---

2. Plaintiff's objections to defendants' exhibits 20, 21, and 23 are overruled. Plaintiff's objections to defendants' exhibits 26–35 are likewise overruled. Defendants' objection to plaintiff's exhibit 6 is sustained. Defendants' objection to plaintiff's exhibit 20 is overruled. Any objections to any other exhibits not resolved at the hearing are overruled. *See* Dkt. 67 at 8–9.

Objections to deposition designations have also been considered and are overruled as to any facts stated herein.

3. A managing general agent "manages all or part of the insurance business of an insurer" and "acts as an agent for such insurer" and also "[a]djusts or pays claims" and/or "[n]egotiates reinsurance on behalf of the insurer." Fla. Stat. § 626.091(1).

4. The Liberty American Insurance Group also oversees the following affiliated entities: MHIA, Liberty American Premium Finance Company, Mobile USA Insurance Company, Liberty American Insurance Company, and Liberty American Insurance Agency.

Company as a data operator in 1994, became operations manager in the IT department in 1997, and moved to the marketing department in 1999, where he eventually became assistant vice president of marketing.

11. Vincent joined The Jerger Company as a computer programmer on January 1, 1989, after having worked as a programmer for Micro Business Solutions, a company that had provided information technology and programming services to The Jerger Company. Eventually, he became second-in-command of the IT department and, subsequently, director of IT.

12. In 1997, The Jerger Company distributed a Confidentiality and Inventions Agreement to each of its employees. Both Jerger and Vincent signed this agreement.

13. The Confidentiality and Inventions Agreements provided, among other things, that: (1) the employee would not disclose or use any proprietary information [5] belonging to the company except in connection with Jerger duties or with the express written consent of the Jerger company; and (2) all computer programs and other materials made available to the employee were the exclusive property of the Jerger company and shall be delivered to the company upon termination of employment with Jerger or at any time at Jerger's request.[6] The agreement also prohibited the employee from working with any business that is competitive to or in conflict with The Jerger Company.

*Liberty American's Software Program*

14. Liberty American has a software system for the rating of mobile-home insurance risk and the calculation of mobile-home insurance premiums.[7] The system initially included, in relevant part, a rating engine, an underwriting database, and a database of information pertaining to mobile-home parks that was known within the company as the park system. It now includes, in relevant part, a rating engine, an HTML Generator, two Javascript libraries (VALIDATE.JS and GUI.JS), and a Help File that contains a Glossary of Terms.

15. Vincent participated in writing The Jerger Company's mobile-home rating software program and its homeowner rating software program.

16. In December 1999, The Jerger Company converted its manufactured-home system into a general homeowner system, thus allowing both systems to be accessed from the same data files. Vincent participated in this conversion during his employment with The Jerger Company.

17. In late 1999 and early 2000, The Jerger Company was developing a rating product for use over the internet.

18. Vincent assisted in the development of an internet rating system for California, which was the first state for which The Jerger Company and its successor, Liberty American, developed an internet rating product. Vincent also participated in the design of both the California manufactured-home rating product and Liberty American's HTML Generator.

---

5. "Proprietary information" is defined in the agreement as any information "not generally known in the insurance industry and which gives Jerger a commercial or competitive advantage over its competitors" including "product development," "information regarding real estate," and "computer programs, hardware and software." (Pl's Exs. 3,4)

6. Vincent added the following to his agreement: "I have written various programming utilities and routines on my own time which do not fall within the provisions of this agreement." Pl.'s Ex. 4 at 2.

7. Form and Rate Filings by insurance companies doing business in Florida are available through public records requests.

19. Liberty American has sought and obtained registration of copyrights according to the following descriptions:

a) the rating engine (Registration No. TXU945848, effective March 13, 2001);

b) the Glossary of Terms in the Help File for the website (Reg. No. TXU945849, effective Feb. 15, 2001);

c) the Javascripts used to operate Liberty American's internet-based rating engine (Reg. No. TXU945850, effective Feb. 15, 2001); and

d) the HTML Generator used to operate Liberty American's website (Reg. No. TXU945851, effective Feb. 15, 2001).

20. Attached to the copyright registrations are several illustrative pages of the actual source code covered by the registrations. All of the source code is not included because the copyright registration is a public document.

21. The rating software automates what had previously been a time and labor-intensive mathematical operation. In the past, agents calculated insurance rates using paper, pencil, and a calculator, a task which might take five to ten minutes. Using the rating software, however, agents and customers are able to insert basic personal and demographic information into data fields to obtain within seconds a customized rate quote using the insurance company's publicly filed rates and forms. For an insurance company that uses the internet, applicants for insurance can directly access this information.

*Liberty American's Park List and Park Data File*

22. To assist its agents in writing policies and to streamline the rating process for mobile-home insurance, The Jerger Company and then Liberty American, its successor, also developed a mobile-home park list and park data file. Initially stored in multiple binders, this information was ultimately included in the company's database for use in conjunction with the rating software.

23. The park list contains the name and address of the mobile-home park, the number of units in the park, the type of park (adult or family), and the park's proximity to water, among other information. The park data file includes additional information such as the number of insured units and whether the park has reached the "saturation point" in terms of new policies and risk allocation.

24. The information in the park list and park data file was compiled either from public records or from on-site visits by company employees, agents, and inspectors. It is updated as new information becomes available.

*Efforts to Restrict Disclosure of Proprietary Information*

25. Liberty American takes reasonable precautions to keep its proprietary software out of its competitors' hands (absent a licensing agreement) and to prevent its employees from doing the same. Liberty American maintains a secured computer system, allowing only senior management or members of its IT department to access its source code. Employees privy to sensitive or proprietary information are required to sign confidentiality agreements. Companies with whom Liberty American does business are required to sign licensing agreements.

26. Liberty American has shared its park file and park data file with other independent agents on occasion, including Jefferson Insurance.

27. Prior to offering mobile-home insurance in California, Liberty American obtained a California park list from an outside source and used it to develop its park list.

*Jerger's Departure*

28. Sometime between December 1999 and February 2000, John Jerger had initial communications with Doug Vatter, then a vice president at Jefferson, relating to the formation of a company to sell mobile-home insurance in Florida. At the time of this initial contact, Vatter already had investors for the new venture.

29. Jerger and Vatter had further communications over the next weeks about the new company to be known as Westpoint.

30. WestPoint filed Articles of Organization as a limited liability company with the Florida Department of State on March 22, 2000.

31. John Jerger resigned from Liberty American on March 31, 2000 and began employment with Westpoint in April 2000.

32. Jerger testified that he did not take any Liberty American software, park information, or other confidential information when he left the company.

*Vincent's Departure*

33. Shortly after The Jerger Company merged with Liberty American, Vincent began looking for other job opportunities. He took a trip to Montana with John Auer ("Auer"), President of American Strategic Insurance Company ("ASI").[8] While there, Vincent met with Ed Holt ("Holt"), Vice President of Information Services for National Flood Services ("NFS"), a Montana corporation. After their initial introduction, Vincent had several discussions with Holt regarding Vincent's ability to design a software application that would process homeowners insurance.[9]

34. Also in March of 2000, Vincent downloaded onto John Auer's laptop Liberty American's software, including the source code, and the database from Liberty American's main computer which included the park file and park data file. He later transferred this information to his personal computer.

35. Although Liberty American programmers and other IT employees were allowed to use proprietary software when they worked from home or when assisting clients or others with whom they had contractual relations, Vincent did not relinquish possession of Liberty American's software, including source code, and its database when he left Liberty American the following month.[10]

---

**8.** ASI provides homeowners' insurance. The Jerger Company and its successor, Liberty American, were formerly an MGA for ASI in the Florida homeowners' insurance arena. ASI now uses National Flood Services, Inc. ("NFS") as its MGA for Florida homeowners' insurance. When Liberty American was ASI's MGA, Vincent designed a system for ASI that covered rating, issuing, billing, printing, among other tasks. Thereafter, ASI ceased doing business with Liberty American and instead chose NFS as its MGA.

**9.** Originally, NFS processed flood insurance policies for insurance agencies. In the spring of 2000, NFS sought to provide homeowners insurance, as well, and hoped to acquire ASI's business.

**10.** Vincent's testimony that he deleted all Liberty American information from his computer is not credible, especially as he immediately went to work for NFS to develop a rating engine for homeowners insurance, a project for which Liberty American source code would have been a valuable asset. Also, at the time he left Liberty American, Vincent hoped to join Westpoint eventually and knew that Westpoint would compete for the same book of business as Liberty American. Further, Vincent downloaded the information onto a third party's laptop and then transferred it to his personal computer, which suggests efforts to conceal his actions. When deposed, Vincent admitted that his confidentiality agreement would have required him to at least talk with his supervisor before taking Liberty American's source code and giving it to someone outside the company.

36. After Vincent had an unexcused absence from work on or about April 7, 2000, Liberty American terminated Vincent and locked him out of the computer system. That same day, Vincent resigned from Liberty American, effective April 21, 2000. He did not tell anyone at Liberty American that he was in possession of Liberty American software.

37. Vincent began working with NFS immediately after resigning from Liberty American.

38. NFS hired Vincent for his programming skills, his knowledge of the homeowners insurance industry and of ASI's processing methodologies, as NFS hoped to obtain business from ASI once a computer program was written to accommodate ASI's needs.

39. At NFS, Vincent helped develop a software internet rating and quoting system for homeowners insurance. He was one of five or six individuals assigned to do programming work for NFS. NFS provided Vincent access to portions of its source code. Vincent had to sign a non-disclosure agreement but he was told that he could use for other clients any software he developed as long as those clients did not compete with NFS for the same business.

40. Vincent was paid for several months' work on the rating engine and related software for NFS. During this time he had access to the Liberty American rating engine and HTML Generator source code. Although he used a different language for the NFS source code, the variables were very similar to those in Liberty American's source code. Vincent had a strong incentive to use Liberty American's source code because he was hired to write a program that would enable NFS to obtain ASI's business from Liberty American.

*Westpoint's First Six Months*

41. WestPoint had a meeting with Modern Service Insurance Company ("Modern"), around Memorial Day 2000.

42. In July 2000, Modern agreed to write mobile-home insurance in Florida with WestPoint as its MGA.

43. WestPoint submitted its proposed rate filing with the Florida Department of Insurance on or about August 7, 2000.

44. On July 14, 2000, WestPoint hired Vincent to oversee the technology side of WestPoint's business, specifically to write rating engine and related software applications. Although Westpoint considered outsourcing this work, or using third-party vendor software, it concluded that Vincent's experience writing rating engine software would be best for the company.

*Westpoint's Rating Software and Park Data*

45. Vincent developed the software for WestPoint's internet program for rating and generating mobile-home insurance polices. He did not start this project until the first of August. Vincent was unable to recall how long it took to write the program for Westpoint. However, the program was operational on or before October 16, 2000, when WestPoint sold its first policy.

46. Vincent testified that he developed Westpoint's software for rating and generating mobile-home insurance policies on the internet by adapting the homeowners software he had earlier developed for NFS.

47. Vatter, Westpoint's president, stated that he told Vincent to write a system "from scratch."

48. Westpoint also created a park list and park data file from various sources to be used with the rating engine. Most of the information came from the internet. Vat-

ter, who used to work for Jefferson Insurance, had a copy of the park information that Liberty American provided to his company when he worked there. This information was also used to create Westpoint's park list.

49. Jerger, Vincent, and Vatter, with the assistance of perhaps one or two others, completed the park list and park data file for Westpoint in one or two days.

50. In July 2000, Sean McVeigh ("McVeigh"), who became Liberty American's IT director after Vincent left, accessed Westpoint's File Transfer Protocol (FTP) site and downloaded three files, including the source code.[11] McVeigh was surprised that Westpoint's FTP site was not password-protected. McVeigh did not alter the files he downloaded and he turned them over to Liberty American's president, Dan Eldridge.

*The Expert Testimony*

51. At the evidentiary hearing on the motion for preliminary injunction, both sides called experts in computer programming and information technology who analyzed the rating engine and HTML Generator source codes at issue. The experts examined Liberty American's source code as well as two versions of Westpoint's source code: the "old source code" and the "new source code."[12]

52. Mark Stutzbach ("Stutzbach"), Liberty American's expert witness, compared Liberty American's and Westpoint's rating engine and HTML Generator source code. He concluded that substantial parts of Westpoint's code, both old and new, were derived from Liberty American's code, and some parts were directly copied. He opined that it would be "very unlikely" that two programmers would use identical code. Stutzbach acknowledged that if two programmers were asked to write code for an arithmetic function, he would expect the code to be "similar" but not "identical."

53. Dr. Gwendolyn Walton ("Walton") testified for Westpoint. She opined that "there are significant differences" between the Liberty American code and the Westpoint code, both old and new versions. Walton agreed with plaintiff's expert that certain lines of code are identical, but she disagreed with his conclusion. Walton explained that "[t]here is lots of identical code in here. But there has got to be in order for them to do what they are doing." She also disagreed with Stutzbach's observation that programmers are highly individualistic in writing code.

## CONCLUSIONS OF LAW

To obtain a preliminary injunction pursuant to Rule 65, Fed.R.Civ.P., and Rule 4.06, Local Rules, M.D. Fla., the moving party must prove: (1) a substantial likelihood that it will ultimately prevail on the merits; (2) a showing that it will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to it outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Cunningham v. Adams,* 808 F.2d 815, 818–19 (11th Cir.1987) (citation omitted). Maintenance of the status

---

11. FTP is used to transfer data from one source to another, according to McVeigh. McVeigh learned about this site from another Liberty American employee who had also downloaded the files. To verify the information provided by the employee, McVeigh went to Westpoint's website and downloaded the files himself.

12. Westpoint's "old" source code is the original version written by Vincent in mid–2000. Vincent wrote the "new" source code after the lawsuit was filed in this case, approximately February 2001.

quo is the main purpose of preliminary injunctive relief. *Cate v. Oldham,* 707 F.2d 1176, 1185 (11th Cir.1983) (citation omitted).

The Rule 65 standard applies to claims of injunctive relief under state law claims. *Ferrero v. Assoc. Materials, Inc.,* 923 F.2d 1441, 1448 (11th Cir.1991).

"The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *Cunningham,* 808 F.2d at 819 (citation omitted).

Plaintiff's amended complaint includes claims against Westpoint, Modern Insurance Company, Vincent, and Jerger for copyright infringement and misappropriation of trade secrets, among other claims. (Dkt.31.) The complaint also alleges breach of the common law duty of loyalty and breach of contract against Vincent and Jerger. (Dkt.31.)

Plaintiff seeks injunctive relief as to four claims: misappropriation of trade secrets, breach of confidentiality agreements, breach of the duty of loyalty, and copyright infringement as to the rating engine and the HTML Generator source code. (Dkt. 67 at 9–10.)

### I. *Substantial Likelihood of Success on the Merits*

Plaintiff must first show a substantial likelihood that it will ultimately succeed on the merits of its claims.

### A. *Copyright Infringement*

To establish copyright infringement, plaintiff must prove 1) ownership of a valid copyright and 2) copying of constituent elements of the work that are original.

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Mitek Holdings, Inc. v. Arce Eng'g Co.,* 89 F.3d 1548, 1553 (11th Cir.1996).

#### 1. Ownership

Liberty American has a valid registration of its copyright for the rating engine source code and the HTML Generator source code. Westpoint has not presented any evidence demonstrating the invalidity of the copyright registrations.

Westpoint does not contend that Liberty American's rating engine or its HTML Generator source code are not original to Liberty American.[13] It does challenge whether any elements are protectable. That argument is addressed in section 3, *infra.*

Thus, plaintiffs have established the first prong—ownership of a valid copyright. *See Mitek,* 89 F.3d at 1553–54.

#### 2. Copying

The second prong, copying of constituent elements of the work that are original, " 'involves two separate inquiries: 1) whether the defendant, as a factual matter, copied portions of the plaintiff's program; and 2) whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.' " *Mitek,* 89 F.3d at 1554 (citation omitted).

"The 'literal elements' of a computer program are its source and object code." *Mitek,* 89 F.3d at 1555 n. 15. "Source code is a symbolic language that humans can

---

**13.** Westpoint does contend that Liberty American's copyright on the Javascript source code is not original because that source code was derived from a third party. At the evidentiary hearing, however, Liberty American focused on its claim of infringement only with respect to the rating engine and HTML Generator source code, not the Javascript source code.

read, whereas object code is a translation of the source code into a series of zeroes and ones that is readable by a computer." *Id.* It is well settled that the literal elements of computer programs are subject to copyright protection.[14] *Computer Assoc. Internat. Inc. v. Altai, Inc.,* 982 F.2d 693, 702 (2d Cir.1992). "Literal similarity refers to similarity at the code level; ... a verbatim copying of part or all of the source or object codes of a computer program." *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 n. 25 (11th Cir.1996).

Plaintiff alleges that defendants copied the copyrighted source code for its rating engine and HTML Generator: literal copying of literal elements.[15]

Proof of copying may be shown either by direct evidence of copying or, in the absence of such evidence, copying "may be inferred from indirect evidence demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work."[16] *Mitek,* 89 F.3d at 1554 (citation omitted).

Vincent denies copying or using Liberty American's source code in writing software for NFS and then Westpoint. His testimony is unconvincing. He had access to the source code in his position as Director of IT; he kept updated copies of Liberty American's source code at home; and, just a few weeks before leaving Liberty American, he downloaded documents from Liberty American's main computer onto a laptop owned by ASI's president, John Auer. Vincent retained possession of the source code when he resigned his position with Liberty American in late April 2000.

Mere access is not sufficient to show copying by indirect proof. Although the computer experts disagree on these points, the testimony of Mark Stutzbach and his written analysis arguably establish sufficient "probative similarities" between Liberty American's copyrighted source code and Westpoint's source code for the rating engine and HTML Generator to require consideration of step three of the infringement analysis.

### 3. Protectability

Even after demonstrating that the work copied is original and thus protectable, a plaintiff must show under certain circumstances that the copying "was so extensive that it rendered the offending and copyrighted works substantially similar." *Bateman,* 79 F.3d at 1541 (citation and internal quotation marks omitted). " 'Substantial similarity' in the copyright context refers to appropriation by the putative infringer of the 'fundamental essence or structure' of a protected work." *Mitek,* 89 F.3d at 1551 n. 5 (citation omitted). More-

---

**14.** "[T]he products that are generated by the code's interaction with the computer hardware and operating program(s)" such as screen displays and menu commands are the nonliteral elements. *Mitek,* 89 F.3d at 1555 n. 15.

**15.** Although this has not been raised by defendants, this court notes that Liberty American did not obtain the four copyrights on portions of its source code until February and March 2001, nearly a year after Jerger and Vincent left Liberty American.

**16.** "Probative similarity" and "substantial similarity" refer to two distinct steps in the copyright infringement analysis. *Castle Rock Entm't v. Carol Publ'g Group,* 150 F.3d 132, 137 (2d Cir.1998) (citations omitted). "Probative similarity" is the correct term in referring to plaintiff's initial burden of proving actual copying by indirect evidence. *Id.* If actual copying is established, a plaintiff must then show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works. *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139–140 (2d Cir.1992).

over, "substantial similarity" refers to the program as a whole, not constituent elements of the program. *Id.* at 1560, n. 26 (citation omitted).

To determine whether the elements of a putative infringer's computer program are substantially similar to the protectable elements of a plaintiff's program, the court looks to the relative importance of the copied elements to the overall program. *Id.* at 1559.

The "abstraction-filtration-comparison" test delineated by the Second Circuit in *Comp. Assoc. v. Altai* and adopted by the Eleventh Circuit applies to nonliteral copying of nonliteral elements. *Bateman,* 79 F.3d at 1545. The test enables a court to separate protectable expression from unprotected ideas when determining whether the nonliteral elements of two or more computer programs are substantially similar. *Mitek,* 89 F.3d at 1555.

In *Bateman,* the Eleventh Circuit considered the difficulties of instructing a jury in a computer software copyright infringement case on the issue of protectability as to literal aspects of a computer software program. 79 F.3d at 1542–1546.

Concluding that "it makes little difference which methodology is employed," the court did not express an opinion "as to whether it is better to consider these challenges to literal copying [merger and efficiency, among others,] as part of the filtration step or rather to consider them in a separate, yet parallel, analysis." *Id.* at 1545.[17]

Other courts have employed the abstraction-filtration-comparison test to claims of copyright infringement of source code at the preliminary injunction stage. *See, e.g.,*

*Control Data Sys., Inc. v. Infoware, Inc.,* 903 F.Supp. 1316, 1322–24 (D.Minn.1995).

Once a court determines the abstraction levels of a computer program, it engages in a filtration process by "examining the structural components at each level of abstraction" to separate protectable expression from non-protectable material. *Computer Assocs.,* 982 F.2d at 707 (citation omitted).

Source code and object code occupy a place at the lowest level of abstraction in the structure of a computer program. *Control Data,* 903 F.Supp. at 1322 (citation omitted). These aspects of a program "will almost always be found to be protectable expression unless the doctrines of merger and *scenes a faire* come into play." *Gates Rubber Co. v. Bando Chemical Indus.,* 9 F.3d 823, 836 (10th Cir.1993) (citations omitted). The merger doctrine denies copyright protection to "expression that is inseparable from or merged with the ideas, processes, or discoveries underlying the expression." *Gates Rubber,* 9 F.3d at 838.

The *scenes a faire* doctrine "excludes from protection those elements of a program that have been dictated by external factors" such as "hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices and demands, and computer industry programming practices." *Id.* (internal citations and footnotes omitted).

Liberty American's HTML Generator dictates how information from a website will be viewed on the computer screen. Similarly, the rating engine source code

---

**17.** The *Bateman* court emphasized, however, that "[w]here a portion of the computer program constitutes an unprotectable method of operation or process, it is not an expressive part of the work. It is particularly important to exclude methods of operation and processes from the scope of copyright in computer programs because much of the contents of computer programs is patentable." 79 F.3d at 1541 n. 21.

employs a series of mathematical calculations to calculate the premium payment for a mobile-home insurance policy. The parties' computer experts, while offering divergent opinions as to whether Westpoint's source code was derived from Liberty American's source code, agreed that certain arithmetic or design functions (e.g., drawing a box) limit how those ideas can be expressed.

"While, hypothetically, there might be a myriad of ways in which a programmer may effectuate certain functions within a program,—i.e., express the idea embodied in a given subroutine—efficiency concerns may so narrow the practical range of choice as to make only one or two forms of expression workable options." *Computer Associates*, 982 F.2d at 708 (citation omitted).

It is at this stage of the copyright infringement analysis that plaintiff's claim flounders. Liberty American has not presented to this court a meaningful analysis of the protectability of its source code for the rating engine and the HTML Generator, whether within the parameters of the abstraction-filtration-comparison test or some parallel analysis. Although it is the court's task to determine protectability, it is Liberty American's burden to establish a likelihood of success on each element of its copyright infringement claim. While not binding on the court, the opinions of computer experts would at least provide some assistance to the court in its independent analysis of what aspects of the copyrighted software are protectable. *See generally Autoskill, Inc. v. Nat'l Educ. Support Sys. Inc.*, 793 F.Supp. 1557, 1567–1569 (D.N.M.1992), *aff'd*, 994 F.2d 1476 (10th Cir.1993), *cert. denied*, 510 U.S. 916, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993).[18]

The evidence presented at this juncture is insufficient to permit the court to identify what elements, if any, of Liberty American's copyrighted rating engine and HTML Generator are protectable and what aspects are covered by either the merger or *scenes a faire* doctrines.[19]

Because the filtration analysis is a necessary step before the two source codes can be compared to complete the three-step analysis for protectability,[20] Liberty American has not shouldered its burden of establishing a likelihood of success on its claim of copyright infringement.

B. *Misappropriation of Trade Secrets*

The Uniform Trade Secrets Act, Fla. Stat. § 688.001 *et seq.*, permits injunctive

18. At the trial on the merits on plaintiff's copyright claims, the trial court may wish to appoint its own expert to examine this issue.

19. Liberty American's arguments are not materially advanced by the district court's opinion in *Quinn v. City of Detroit*, 23 F.Supp.2d 741, 747, 747 n. 1 (E.D.Mi.1998) (source code for a case management computer program did not merely contain standard techniques found in any data management system, nor were mere algorithms unprotectable). The court found that, because plaintiff's software contained other functions which former systems did not, it could not be said to contain only standard techniques. *Id.* at 747. The Eleventh Circuit's *Bateman* and *Mitek* decisions arguably require more rigorous analysis by the court in filtering out protectable from unprotectable elements of a software program.

20. Once the court has filtered out the elements of the software program that are unprotectable, it completes the third step of the analysis by comparing what protectable elements remain in the copyrighted product with the alleged infringing product. *Gates Rubber*, 9 F.3d at 838–39. The court "must decide whether those protectable portions of the original work that have been copied constitute a substantial part of the original work.... This is primarily a qualitative rather than a purely quantitative analysis, and must be performed on a case by case basis." *Id.* (internal citations omitted).

relief to redress any actual or threatened misappropriation of trade secrets.

A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process that a) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. §§ 688.002(4)(a), 688.002(4)(b).

However, "an employer may not preclude its former employee from 'utilizing contacts and expertise gained during his former employment.'" *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir.1998) (citation omitted).

A computer program is a trade secret if it meets the two pronged test. *CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F.Supp. 337, 357 (M.D.Ga.1992) (under Georgia's version of the Uniform Trade Secrets Act, which is nearly identical to Florida's statute, computer programs that satisfy the two-pronged test are trade secrets).

Liberty American's rating software, including its source code, qualifies as a trade secret under Florida law.[21] It has independent economic value because it is not known to and is not readily ascertainable by other persons who could derive economic value from its disclosure. Liberty American also takes reasonable efforts to maintain the secrecy of its rating software, including source code.[22]

Plaintiff contends that both Vincent and Jerger as well as Westpoint misappropriated its rating engine software. Because this court has found that Vincent, in all likelihood, copied or used Liberty American's source code in writing the rating engine software for Westpoint, plaintiff has demonstrated a prima facie case as to Vincent's liability. Vincent had a duty not to use the source code—a trade secret acquired during the course of his employment with Liberty American—for his own benefit or that of another. By using and copying Liberty American's program after he left Liberty American, he did just that.

As to Jerger and Westpoint, however, the evidence does not demonstrate a reasonable likelihood of success on plaintiff's claim that Jerger and Westpoint also misappropriated Liberty American's source code or induced or persuaded Vincent to use the Liberty American source code in developing source code for Westpoint.

Jerger and Vatter knew that Vincent was adapting the software he wrote for NFS to create the rating software for Westpoint. However, it is not clear whether they knew, or had reason to know, that Vincent used the Liberty American source code to create either NFS' or Westpoint's rating product. There is no direct evidence that either Jerger or Vatter knew that Vincent had retained possession of Liberty American's source code when he left that company and would have used it in creating the program for NFS or Liberty American.

**21.** The fact that plaintiff's claim of copyright infringement may be in doubt does not insulate defendants from liability for misappropriation of trade secrets.

**22.** Liberty American restricts access to its software, including source code, to its pro-
grammers and to third parties who have licensing agreements with Liberty American. Liberty American protects the proprietary nature of this information by requiring key employees with access to the software to sign confidentiality agreements.

Liberty American also claims that its park file and park data file are trade secrets.

Liberty American's park file and park data file contain information that is primarily available through the public record or through inspection of park properties. The company shared this information with other insurance agents, including Jefferson Insurance. Although the list took considerable time to compile, Liberty American has not shown a reasonable likelihood that the park file and park data file contain information not readily available to the public and thus meet the definition of a trade secret under Florida law. *See, e.g., Thomas v. Alloy Fasteners, Inc.*, 664 So.2d 59, 60 (Fla. 5th DCA 1995) (customer lists obtained from public sources, with nothing secretive regarding the class of likely customers, obtained by methods that are not "magical or secret," are not protected as trade secrets); *see also Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288, 289–90 (Fla. 2d DCA 1998).

Further, Westpoint's park file was developed mostly through information available on the internet; only about twenty percent of its database came from the Liberty American file that Doug Vatter used when he worked for Jefferson Insurance.

### C. Breach of the Confidentiality Agreement and Breach of the Duty of Loyalty

Both John Jerger and Lyle Vincent signed confidentiality agreements with Liberty American in 1997. Liberty American claims that both breached their duty of loyalty as well as their confidentiality agreements by appropriating its source code, park file, and park data file.

"The general rule with regard to an employees' duty of loyalty to his employer is that an employee does not violate his duty of loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment. However, that employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment." *Fish v. Adams*, 401 So.2d 843, 845 (Fla. 5th DCA 1981) (citation omitted).

"Parties are entitled to enter into contracts in which they agree not to use or disclose confidential information, even though the information may not qualify as a trade secret in a legal sense." *Concept, Inc. v. Thermotemp, Inc.*, 553 So.2d 1325, 1327 (Fla. 2d DCA 1989) (citation omitted), *rev. denied by* 574 So.2d 140 (Fla.1990).

Liberty American has shown a reasonable likelihood of success on its claim that Vincent's retention and use of Liberty American's software also breached his confidentiality agreement with Liberty American. Vincent did not own the software; rather, it belonged to the company and Vincent entered into an agreement restricting its use.

Liberty American has not shown a sufficient basis at this point to hold Jerger liable for Vincent's actions, or to find that Jerger violated his confidentiality agreement and duty of loyalty towards Liberty American. Jerger denied taking or using any confidential information when he left Liberty American, and there is no evidence to date impugning his denial.

### II. Irreparable Harm

Plaintiff must next establish that it will suffer irreparable harm absent injunctive relief.

Liberty American's President stated that his company had lost "hundreds of thousands of dollars" due to defendants'

actions. He estimated that his company would have issued a substantial number of the 11,000 mobile-home insurance policies written by Westpoint in its first few months of operation had it not been for the use of Liberty American's proprietary information. Although Liberty American may not be able to presently calculate the amount of damages it claims, it does appear, based on the testimony of Liberty American's President, that money damages can be quantified to redress plaintiff's injury if it prevails at trial.

"The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Dice v. Clinicorp, Inc.*, 887 F.Supp. 803, 809 (W.D.Pa.1995) (citations omitted).

Plaintiff contends that irreparable injury is presumed with copyright infringement and misappropriation of trade secrets. That proposition is well established in copyright infringement cases. *See, e.g., Rice v. American Program Bureau*, 446 F.2d 685, 688 (2d Cir.1971) (citations omitted). However, that proposition is not clear cut as to trade secret misappropriation.

At the hearing in this case, plaintiff was not seeking to enforce an alleged non-compete agreement. Fla. Stat. § 542.33 provides for enforcement of non-compete agreements under certain circumstances and has an express provision that the disclosure of a trade secret gives rise to a presumption of irreparable harm. *See, e.g., Lovell Farms, Inc. v. Levy*, 641 So.2d

103, 105 (Fla. 3d DCA 1994); *see also Sun Elastic Corp. v. O.B. Industries*, 603 So.2d 516, 516–17 (Fla. 3d DCA 1992). Both of these cases involved enforcement of a non-compete agreement, however.[23]

The Confidentiality and Inventions agreements which Jerger and Vincent signed with The Jerger Company contained no such provisions for injunctive relief or stipulation as to irreparable injury.

Plaintiff has shown a reasonable likelihood of success on its claim of trade secret misappropriation and breach of confidentiality agreement as to Lyle Vincent.

On balance, Liberty American has not shown that it will suffer irreparable injury absent injunctive relief on these claims.

### III. *Balance of Hardships*

Plaintiff must also prove that its threatened injury outweighs whatever damage the proposed injunction may cause the opposing party.

The relief sought by Liberty American is to preliminarily enjoin (1) Vincent and Jerger from working for Westpoint and (2) Westpoint from using its rating software and park file information. (Dkt. 67 at 24,44.)

Because Liberty American has not shown that it will suffer irreparable harm absent injunctive relief, proceeding to the third step of the Rule 65 analysis is not necessary. In any event, Liberty American has not demonstrated that the hardship it will suffer in the absence of an injunction outweighs the hardship to the

---

**23.** Plaintiff cites the case of *Stoneworks Inc. v. Empire Marble and Granite Inc.*, 49 U.S.P.Q.2d 1760 (S.D.Fla.1998) for the proposition that "[i]rreparable harm is also presumed in cases of breach of non-compete and confidentiality provisions where the employee revealed specific trade secrets to his employer." The Florida case cited by *Stoneworks* in

support of this proposition is *Concept, Inc. v. Thermotemp, Inc.*, 553 So.2d 1325, 1327 (Fla. 2d DCA 1989). An examination of the *Concept* decision, however, does not support this holding. Plaintiff in *Concept* sought to enforce an agreement in which the parties had *stipulated to* injunctive relief and a finding of irreparable injury in the event of breach.

defendants if Vincent and Jerger were prohibited from working for Westpoint and Westpoint were prohibited from using its rating software.

In particular, the preliminary injunctive relief it seeks would alter the status quo and award Liberty American nearly all the relief it would be entitled to at a trial on the merits if it prevailed. In such circumstances, courts impose a higher standard for injunctive relief, which has not been met in this case. *See, e.g., Phillip v. Fairfield University,* 118 F.3d 131, 133 (2d Cir.1997). Moreover, "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews,* 544 F.2d 1233, 1243 (5th Cir.1976). Plaintiff has not met this higher standard.

### IV. *Public Interest*

If Liberty American had prevailed on the first three requirements for preliminary injunctive relief, it would also have to prove that an injunction, if issued, would not be adverse to the public interest. Liberty American contends that prohibiting defendants from using Liberty American's proprietary information serves the public interest by protecting property rights. Westpoint argues that an injunction will not serve the public interest because it would prevent it from writing mobile-home insurance in Florida, a market that is not attractive to insurers because of the potential catastrophic losses caused by hurricanes. It is not necessary to balance these competing interests because Liberty American has not established that it will be irreparably harmed and that the balance of hardships favors injunctive relief.

### CONCLUSION

Liberty American has not met its burden of proof as to all four prerequisites for preliminary injunctive relief under Rule 65, Federal Rules of Civil Procedure.

Accordingly, and upon consideration, it is **RECOMMENDED** that **Plaintiff's Motion for Preliminary Injunction (Dkt.2)** be **DENIED.**